# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. RAFAEL HERNANDEZ, | ) | |
|     Petitioner, | ) | |
| | ) | |
|     v. | ) | 05 C 2089 |
| | ) | |
| ALAN UCHTMAN, | ) | |
|     Respondent. | ) | |

## **MEMORANDUM AND ORDER**

Petitioner Rafael Hernandez's pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is before the court. For the following reasons, Hernandez's petition is denied.

**I.  Background**

The court will presume that the state court's factual determinations are correct for the purposes of habeas review as Hernandez has not provided clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002). The court thus adopts the state court's recitation of the facts, and will briefly summarize the key facts which are relevant to Hernandez's § 2254 petition.

*Hernandez's Statement*

Hernandez was at the scene of a shooting in July of 1998 and was subsequently arrested. At the police station, he gave a statement to Assistant State's Attorney Karen Kerbis. Hernandez admitted that he was a member of the Latin Kings and that he went to meetings to discuss gang business such as territorial boundaries. He also stated that, on the night of the shooting, he and three other Latin Kings were seeking to avenge the death of Thomas Giannokopulos, a fellow gang member. According to Hernandez, he had asked fellow gang member Anthony Clark for a

gun so that he could shoot some members of the rival gang Insane Popes, but Clark refused to give it to him. Hernandez then stated that if he had obtained a gun, he would have ensured that he shot a rival gang member and not an innocent bystander.

Hernandez also said that he was standing on the corner of Campbell and Balmoral when he saw a car turn onto Balmoral. Hernandez approached the car and asked whether the occupants were affiliated with a gang. None of the occupants showed signs of gang membership. The car proceeded down Balmoral to the alley and turned left. A short while later, Clark fired at the car.

*Hernandez's Trial*

At trial, Khaled El-Helo, Joe DeClet and Mike Kowalski testified that in the early morning hours on the day of the shooting, they were riding in El-Helo's convertible with Soberon and El-Helo was driving. As they reached the intersection of Campbell and Balmoral, Hernandez and some other men approached the car from behind some trees. Hernandez flashed gang signs and yelled, "What's up, folks." DeClet and Kowalski answered that they were not affiliated with a gang. In response, Hernandez yelled, "We're Kings, we're King love."

After El-Helo drove past Hernandez, El-Helo, DeClet and Kowalski heard several shots. DeClet was able to see the shooter, who ran in the direction of the car as he fired. The shooter was not Hernandez. One of the bullets struck Soberon in the head, inflicting a fatal wound. The caliber of the bullet recovered from Soberon matched that of the casings found at the scene of the shooting. El-Helo, DeClet and Kowalski each identified Hernandez as the person who initially approached the car.

A Chicago police department gangs investigator testified that when a Latin King is killed by a member of a rival gang, the Latin Kings retaliate by killing a member of the rival gang. The

investigator opined that Hernandez's tattoos identified him as a Latin King and that the intersection where the shooting took place was in the territory of a gang that was a rival of the Latin Kings.

Detective Elmore, who worked on the investigation of Hernandez, testified that he learned about the murder of Giannokopulos during the course of his investigation. The prosecutor asked Elmore if Giannokopulos was a gang member, defense counsel objected, and the objection was sustained. In addition, the prosecutor twice attempted to elicit testimony from Elmore regarding Christopher Hamill, the brother of one of the men in the car on the day of the shooting. Hamill had gone with detectives to point out where Hernandez lived. Elmore testified that Hamill went with him to "point out possible residences" and that he went to 4815 North Fairfield with Hamill "to point out the location of – [defense counsel objected, the objection was sustained, and the court ordered the response struck from the record]".

Hernandez took the stand in his own behalf in his case in chief. The defense's theory of the case was that Hernandez was not accountable for Clark's acts because Hernandez was not acting in concert with Clark. Hernandez admitted that he was a member of the Latin Kings and stated that he had been a member for about four years. He testified that he was standing by a mailbox at the corner of Campbell and Balmoral on the date and time in question. According to Hernandez, he was not aware that he was in Popes territory, was not looking for a Pope to shoot, and was unaware that Clark was armed.

Hernandez testified that he saw a car coming towards him and as the car came by, he yelled, "What's up, folks" to determine if the car's occupants were in a rival gang. The car's occupants said that they were not in any gang and drove away. A few seconds later, Hernandez heard someone shout, "King love," and the sound of gunshots. He ran away when he heard the

sound of gunfire. Hernandez also testified that his post-arrest statement, which he had unsuccessfully sought to suppress, was a product of police coercion, consisting of physical abuse, threats and promises that he would be able to go home if he confessed to the offense.

During cross-examination, the State attempted to impeach Hernandez by establishing that the intersection of Campbell and Balmoral was Popes territory. To do so, the State showed Hernandez a picture of a mailbox with "KK" and "P" and Hernandez stated that the letters stood for "King Killer" and "Popes," respectively. Hernandez admitted that he had been standing by the mailbox for approximately thirty minutes, but denied that there was any writing on the mailbox. Defense counsel did not object to the admission of the photographs but when the photographs were taken into the jury room during deliberations, he later argued that they lacked foundation because no one testified as to when they were taken or who took them.

In rebuttal, the State called Detective Mannion, who testified that Hernandez was read his Miranda rights and was not coerced by police during interrogation. Assistant State's Attorney Kerbis also testified in rebuttal and stated that she read Hernandez his Miranda rights prior to taking his written statement and gave him an opportunity to discuss the treatment he received while in custody. She also denied that Hernandez had told her he had been mistreated.

In closing arguments, the prosecutor said, among other things:

> How proud he is, crowned literally from shoulder to hand, his nickname all the way down his ankle. Very proud of his gang membership. Doesn't want you to see that today. He's not telling you he's not responsible. If he took responsibility for what he did that night, we wouldn't be here. He puts on a suit and coat and some fake glasses and doesn't want you to see him as Isaac and Joe and Mike and Khaled did. The gang banger throwing up the signs, yelling what's up folks, king love. But there is a problem he has and that's that you took an oath 2 days ago to follow the law . . . . And per your oaths you took to be true to [] yourselves, you have to follow the law.

The prosecutor also argued, "Well, folks, look at the statement . . . . There are factors in her that only he could tell you . . . . Only a person involved in the crime, this is not anyone telling him anything."

The jury found Hernandez guilty of first-degree murder and three counts of attempted first-degree murder under an accountability theory. He was sentenced to a term of 40 years for first-degree murder and 30 years for each charge of attempted first-degree murder, all sentences to run concurrently with one another.

*Post-trial proceedings*

On direct appeal, Hernandez argued, among other things, that the trial court should have excluded the photographs of the mailbox because they were unauthenticated. The state court held that Hernandez had waived this argument because he failed to lodge a contemporaneous objection or to include it in a post-trial motion. It also found that the admission of the photographs did not deprive Hernandez of a fair trial due to the overwhelming evidence presented at trial as the jury did not believe that the police coerced Hernandez, his confession implicated him in the shooting, and the other witnesses at the scene all testified to a version of events consistent with the confession.

Hernandez also argued that the prosecutor's comments during closing arguments were improper. The state court held that any such arguments were waived because Hernandez did not object at trial or raise this issue in his post-trial motions. It then found that the remarks did not rise to the level of plain error because the evidence against Hernandez (the testimony of three eyewitnesses and Hernandez's confession) was "overwhelming " and the allegedly improper remarks neither affected the fairness of the trial nor substantially prejudiced Hernandez when viewed in the context of the entire closing argument and in relation to the evidence. The

appellate court subsequently affirmed Hernandez's conviction and sentence and the Illinois Supreme Court denied Hernandez's petition for leave to appeal ("PLA") with regard to the issues discussed above.

On December 21, 2003, Hernandez filed a pro se petition for post-conviction relief, alleging, among other things, that his trial attorney was ineffective because counsel deprived Hernandez of his right to determine whether he would testify at trial. In support of his petition, Hernandez submitted his own affidavit in support of his contention that his attorney, without discussing the matter with him, told the judge that he would testify and then adopted a trial strategy that left him no option but to testify.

The trial court summarily dismissed Hernandez's petition and the Illinois Appellate Court affirmed. In its opinion, the Illinois Supreme Court framed the issue as one arising under the Sixth Amendment, citing to *Strickland v. Washington*, 466 U.S. 668 (1984). It then held that under *Strickland*, "[t]o show prejudice, a defendant must establish a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *People v. Hernandez,* 351 Ill.App.3d 28, 39 (1st Dist. 2004), *quoting Strickland*, 466 U.S. at 694. It then stated that Hernandez could not establish that he was prejudiced by taking the stand since the evidence of his guilt was "overwhelming," explaining that:

> Defendant's theory of the case was that he was not aware of what was going to happen in the early hours of June 25, 1998, nor did he know that Anthony Clark had a gun. Defense counsel further alleged that defendant spoke to the victims to make sure that he himself was not being threatened in any way. However, the prosecution's witnesses directly contradicted defendant's theory of the case. Three surviving victims, Kowalski, El-Helo and DeClet, were able to place defendant at the scene of the shooting. All three of them picked defendant out of a lineup while he was in custody. All three identified defendant in court as

> being among a group of gang members, one of whom fired a fatal shot at their friend. Their testimony was clear, consistent, and unimpeached.
>
> Equally damaging to defendant was the confession he gave to ASA Kerbis. In it, he admitted to formulating a plan with three other gang members to get a gun and search out some members of the rival street gang to shoot and kill. Defendant stated that he asked Clark for a gun, but Clark refused to give it to him. Defendant even told ASA Kerbis that had he had a gun, he would have made sure that they shot a rival gang member and not an innocent bystander.
>
> At trial, defendant did not introduce any witnesses, other than himself, in support of his theory of the case. We agree with the State that in light of the testimony of the three eyewitnesses and defendant's own confession, there can be no question as to defendant's guilt. Therefore, defendant cannot satisfy the prejudice prong of the *Strickland* test.

*Id.* at 40.

Hernandez filed an unsuccessful PLA raising his ineffective assistance claim. The federal habeas petition before the court, which raises the four claims that Hernandez presented to the Illinois Supreme Court in his direct and state post-conviction appeals, followed.

## II. Discussion

### A. Threshold Matters

The court will begin by summarizing the rules governing exhaustion and procedural default and by recapping the standard of review that guides this court in resolving Hernandez's § 2254 petition.

#### 1. Exhaustion and Procedural Default

Before this court may reach the merits of Hernandez's federal habeas claims, it must consider whether he has exhausted his state remedies and avoided procedural default under Illinois law. *See Mahaffey v. Schomig*, 294 F.3d 907, 914-15 (7th Cir.2002).

### a. Exhaustion of State Court Remedies

To exhaust state court remedies, a petitioner must give the state courts an opportunity to act on each of his claims before he presents them to a federal court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). State remedies are exhausted when they are presented to the state's highest court for a ruling on the merits or when no means of pursuing review remain available. *Boerckel*, 526 U.S. at 844-45, 847; 28 U.S.C. § 2254(c). Here, the respondent concedes that Hernandez has exhausted his state court remedies.

### b. Procedural Default

Procedural default occurs when a petitioner fails to comply with state procedural rules. *Mahaffey*, 294 F.3d at 915. This occurs when the petitioner fails to pursue all appeals required by state law, *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), or fails to fully and fairly present his federal claims to the state court, *Boerckel*, 526 U.S. at 844. It also occurs when the state court did not address a federal claim because the petitioner failed to satisfy an independent and adequate state procedural requirement, *Stewart v. Smith*, 536 U.S. 856 (2002). If an Illinois appellate court finds that a claim is waived, that holding constitutes an independent and adequate state ground. *Rodriquez v. McAdory*, 318 F.3d 733, 735 (7th Cir.2003).

Nevertheless, this court may still reach the merits of a procedurally defaulted claim if the petitioner establishes either cause for his failure to follow a rule of state procedure and actual prejudice, or that the default will result in a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To establish a fundamental miscarriage of justice, the petitioner must present new and convincing evidence of his innocence by showing that it is more likely than not that no reasonable juror would convict him in light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## 2. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). In *Williams,* the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *See id.* at 405.

With respect to the "unreasonable application" prong under § 2254(d)(1), a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407. A state court's application of Supreme Court precedent is unreasonable if the court's decision was "objectively" unreasonable. *See Lockyer v. Andrade,* 123 S.Ct. 1166, 1174 (2003) (unreasonable application more than incorrect or erroneous). In order to be considered unreasonable under this standard, a state court's decision must lie "well outside the boundaries of permissible differences of opinion." *See Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Searcy v. Jaimet,* 332 F.3d 1081, 1089 (7th Cir. 2003) (decision need not be well reasoned or fully reasoned and is reasonable if one of several equally plausible outcomes); *Schultz v. Page,* 313 F.3d 1010, 1015 (7th Cir. 2002) (reasonable state court decision must be minimally consistent with facts and circumstances of the case).

B.     Hernandez's Claims

1.     Admission of Photographs of the Mailbox

As noted above, the State introduced two photos of a mailbox with gang names allegedly written on it. Hernandez asserts that the trial court erred in allowing the admission of the photographs because they were not properly authenticated and contends that the admission of the photographs rendered his trial fundamentally unfair in violation of his due process rights.

The respondent argues that this claim is barred by the independent and adequate state ground doctrine because Hernandez did not object to the admission of the photographs at trial or raise the objection in a timely post-trial motion. The state court found that Hernandez did not properly object to the admission of the photographs and that, in any event, the admission of the photographs did not deprive Hernandez of a fair trial due to the overwhelming evidence presented at trial. Even if this argument was properly preserved, it does not support a grant of habeas relief.

Habeas relief based on an allegedly erroneous state court evidentiary ruling is appropriate only if the ruling prevented the defendant from receiving a fundamentally fair trial. *United States ex rel. Lee v. Flannigan*, 884 F.2d 945, 952 (7th Cir. 1989). A defendant does not receive a fundamentally fair trial if the challenged ruling "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

Hernandez asserts that the photographs lacks foundation and thus were inadmissible, and that the jury's consideration of the photographs was "decisively prejudicial" and thus prevented him from receiving a fair trial. In support, he asserts that without the photographs, the jury might have believed his testimony. Hernandez, as summarized above, admitted that he was a member of the Latin Kings but testified that he was not aware that he was in Popes territory, was not

looking for a Pope to shoot, was unaware that Clark was armed, and was not responsible for Clark's decision to shoot at the car. He also testified that his incriminating post-arrest statement, which essentially stated that Hernandez was out looking for a member of the Popes to kill in revenge for the murder of a Latin King, was a product of police coercion.

However, the record indicates that the photographs were an insignificant part of the case against Hernandez. Hernandez's statement was consistent with the testimony of three eyewitnesses, a gang specialist testified that the area where the shooting took place was in Popes territory, Hernandez admitted in his sworn statement (which the jury believed, as opposed to Hernandez's attempt to recant at trial) that he went to gang meetings where territorial boundaries were discussed, and forensic evidence corroborated the eyewitnesses' version of events. The state court thus concluded that the evidence against Hernandez was "overwhelming."

This court finds that the state court correctly identified the controlling law as it focused on whether the ruling regarding the photographs caused the trial to be fundamentally unfair. It also reasonably applied the law to the facts, as the photographs were but a stone in a mountain of evidence showing that Hernandez knew full well he was in Popes terrritory. Accordingly, the court finds that the admission of the photographs did not prevent Hernandez from receiving a fundamentally fair trial.

### 2. Detective Elmore's Testimony

Hernandez also contends that the trial court erred in admitting hearsay evidence (regarding Giannokopulos' murder and Hamill's implication of Hernandez) in violation of his right under the Sixth Amendment Confrontation Clause. The Illinois Appellate Court noted that the evidence did not in fact appear to be hearsay so there was no need to exclude it. It also held that regardless, Hernandez was not prejudiced under Illinois law because the trial court struck the

testimony and instructed the jury to disregard it. It also stressed that in any event, the jury legitimately heard the substance of the alleged hearsay later in the trial.

Where the state appellate court ruled on the merits of an argument raised by the petitioner but does not discuss the claim with reference to federal law, the state court's failure to apply federal law is irrelevant if the standard the state court applied is as demanding as the federal standard. *Oswald v. Betrand*, 374 F.3d 475, 477 (7th Cir. 2004), *citing Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam); *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). In this case, the Illinois Appellate Court held that the jury was properly instructed and that regardless, any error was harmless since the evidence at issue came in through other channels later in the trial.

This is consistent with the federal standard, under which the court "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (internal quotations and citations omitted). The judge sustained Hernandez's objections, did not allow Elmore to answer, and gave curative instructions when the prosecutor asked Elmore if Giannokopulos was a gang member. In addition, the judge cut off Elmore when he attempted to offer testimony about Hernandez's residence. Hernandez does not suggest that the jury was incapable of following the judge's instructions.

Moreover, there can be no prejudice, let alone devastating prejudice, because the disputed evidence came in via other witnesses elsewhere in the trial. Specifically, the jury heard about Giannokopulos' gang membership when they heard Hernandez's statement, and learned that

Hamill gave information to the police when Hernandez testified that the police showed him Hamill's statement. Accordingly, Hernandez has not established that the state court's rulings were contrary to or an unreasonable application of *Greer*.

### 3. The Prosecutor's Closing Argument

In his closing argument, the prosecutor, among other things, stated that, "[i]f [Hernandez] took responsibility for what he did that night, we wouldn't be here," said that Hernandez was wearing "fake glasses" at trial, and urged the jury to find Hernandez guilty. Hernandez contends that these statements were improper and violated his due process rights. The Illinois Appellate Court found that Hernandez had waived these issues because his counsel did not object at trial or raise them in post-trial motions, and thus reviewed the propriety of the closing arguments using a plain error standard of review. Because the state court found that Hernandez failed to satisfy an independent and adequate state procedural requirement and thus was only entitled to plain error review, its finding of waiver is an independent and adequate state ground. *See, e.g., Rodriquez v. McAdory*, 318 F.3d at 735.

This brings the court to whether the Illinois courts' determination that the prosecutorial misconduct was not prejudicial is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. When addressing Hernandez's prosecutorial misconduct argument, the Illinois Appellate Court concluded that Hernandez was not prejudiced by the State's comments. The appellate court based its decision on Illinois case law which holds that because prosecutors are permitted wide latitude in their closing arguments, reversible error exists only if the remarks substantially prejudice the defendant. *See People v. Kirchner*, 194 Ill.2d 502, 549 (Ill. 2000); *People v. Armstrong*, 183 Ill.2d 130, 145 (Ill. 1998). The appellate court then concluded that because the evidence against

Hernandez was so overwhelming, the remarks at issue could not have been "a material factor in the conviction or that the jury's verdict might have been different absent the remark."

As noted above, state courts are not required to cite United States Supreme Court cases or even be aware of such law if neither the reasoning nor the result of the state court decision contradicts clearly established Supreme Court precedent. *See, e.g., Early v. Packer*, 537 U.S. at 8. Here, the Illinois Appellate Court relied on Illinois law, and the relevant federal standard is essentially identical. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (the "relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process").

Hernandez does not explain how the Illinois Appellate Court's decision was contrary to, or an unreasonable application of clearly established Supreme Court law. The court concludes that the state court's decision did not contradict clearly established United States Supreme Court precedent. Instead, the Illinois Appellate Court's conclusion that the prosecutor's remarks did not deny Hernandez a fair trial is consistent with the rule set forth in *Darden*. The state court's ruling is also a reasonable application of *Darden* as it satisfies the undemanding requirement that the state court's decision must be minimally consistent with facts and circumstances of the case. Thus, Hernandez's prosecutorial misconduct claim fails.

### 4. Ineffective Assistance

Hernandez's final claim is that his trial counsel was ineffective because he infringed on Hernandez's right to decide whether to testify. According to Hernandez, his attorney, without discussing the matter with him, told the judge that Hernandez would testify and then adopted a trial strategy that left Hernandez no option but to testify. The Illinois Appellate Court correctly noted that Sixth Amendment ineffective assistance of counsel claims are governed by the

well-known *Strickland* standard which requires a defendant to establish that: (1) his counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. at 687-88, 694. The Illinois Appellate Court also correctly observed that if a defendant fails to satisfy one of the *Strickland* prongs, the court's inquiry under *Strickland* ends. *See id*. at 697.

According to the Illinois Appellate Court, Hernandez could not establish that he was prejudiced by taking the stand since the evidence of his guilt was overwhelming, given the testimony of the eyewitnesses and his confession. This is a reasonable application of *Strickland* given that without Hernandez's testimony, the jury would have heard Hernandez's statement (to the effect that he and other gang members planned to get a gun and find members of a rival gang to kill, and that if had he had the gun, he would have made sure he shot a rival gang member and not an innocent bystander) and the consistent testimony of the three eyewitnesses.

In other words, without Hernandez on the stand, there would have been absolutely no evidence supporting Hernandez's theory of the case to counter the State's evidence (which included Hernandez's confession and consistent testimony from all three of the eyewitnesses). If that had occurred, chances are that Hernandez would now be contending that his counsel's representation fell below an objective standard of reasonableness because counsel did not allow the jury to hear the only possible evidence that could have helped Hernandez (assuming that the jury believed Hernandez and discredited the other witnesses' testimony and Hernandez's statement). The state court's decision, therefore, is not an unreasonable application of *Strickland*.

### 5. Exceptions to Procedural Default

The state court found that Hernandez had failed to properly present his claims based on the mailbox pictures and prosecutorial misconduct. A federal court may not grant relief on a procedurally defaulted claim unless the petitioner can establish cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that the court's failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. at 750. Although Hernandez does not contend that cause and prejudice or the fundamental miscarriage of justice exceptions excuse his default, the court will nevertheless consider whether these exceptions can help him.

Cause exists where "some objective factor external to the defense impeded [the petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Here, Hernandez failed to properly follow state procedural rules. Nothing in the record before the court indicates that an objective factor prevented him from doing so. Thus, cause does not excuse his default.

The fundamental miscarriage of justice exception is also inapplicable because "this relief is limited to situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002), *citing Schlup v. Delo*, 513 U.S. 298, 327 (1995). To show "actual innocence," a petitioner must present clear and convincing evidence that, but for the alleged error, no reasonable juror would have convicted him. *Id*. Hernandez's petition, as well as the state court pleadings submitted to the court, do not contain any substantiated allegations of actual innocence. Thus, this exception does not apply.

**III. Conclusion**

For the above reasons, Hernandez's § 2254 petition [1-1] is denied. The clerk is directed to terminate this case and enter a Rule 58 judgment.

DATE: July 21, 2005

_____
Blanche M. Manning
United States District Court Judge